**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER QUINONES, | ) | CASE NO. 1:12-cv-01844 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CITY OF CLEVELAND, | ) | |
| | ) | |
| Defendant. | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |

### I.  Procedural Background

Christopher Quinones (hereinafter "Plaintiff") filed a Complaint on July 18, 2012,

wherein he raised four causes of action against the City of Cleveland (hereinafter "Defendant").

(ECF No. 1.)  The Complaint alleges: (1) unlawful discrimination based on his national origin

resulting in his termination; (2) unlawful retaliation for filing charges with the Ohio Civil Rights

Commission in 2005; (3) discrimination in violation of Ohio Revised Code ("O.R.C.") §

4122.99; and, (4) wrongful discharge under Ohio law.  (ECF No. 1.)  Defendant filed its Answer

on September 6, 2012.  (ECF No. 4.)

On May 2, 2013, the Court held an in-person status conference.  (ECF No. 15.)  The

parties represented that settlement discussions would not be fruitful at that time.  *Id.*

On June 18, 2013, Defendant filed a motion for summary judgment.  (ECF No. 17.)  On July 17, 2013, Plaintiff filed his brief in opposition, to which Defendant replied on July 29, 2013. (ECF Nos. 18 & 19.)

## II.  Summary of Facts

Based on the materials submitted along with the motions and briefs, it does not appear that a great deal of discovery has been conducted.

Defendant admits that it employed Plaintiff, at all relevant times, as a Line Helper Driver, and that he is a member of the International Brotherhood of Electrical Workers, Local 39 collective bargaining unit.  (ECF No. 4 at ¶2; ECH No. 17-1, Exhs. A & B.)

On January 22, 2005, Plaintiff alleges that he engaged in a verbal altercation involving his national origin with a fellow employee, Donald Kleppal.  (ECF No. 1 at ¶3.)  His statement of January 24, 2005 indicated that Kleppal made a racist comment about Puerto Ricans a week earlier and made another racist comment on January 22, 2005 regarding the music on the radio. (ECF No. 18-2, Exh. 1.)

Plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission and the EEOC on January 26, 2005.  (ECF No. 18-3, Exh. 2.)

In a letter dated February 1, 2005, Eric Myles, Labor Relations Officer, reported the results of his investigation into the complaint that Plaintiff had made a physical threat against Kleppal during an argument.  (ECF No. 17-1, Exh. C.)  The report noted the following:

> [Plaintiff] made some serious allegations regarding him and other employees of Puerto Rican descent being exposed to a racially hostile work environment at the West 41st station.  However, we interviewed five current and one former Puerto Rican employee, none of whom could corroborate these assertions.  The former employee is a Puerto Rican female who worked with Kleppal for approximately three and a half years indicated that she never had a problem with him, and that

2

> they got along very well.  In addition, we received two written statements from
> employees, one of whom heard [Plaintiff] make a threatening remark to Mr.
> Kleppal.  The other individual was the Trouble Foreman during the shift on the
> day in question.  He indicated that he was advised by Kleppal that [Plaintiff] had
> threatened him.

*Id*.  Myles found Plaintiff lacked credibility due his evasive responses, inconsistencies, and

refusal to answer specific questions with anything beyond a canned statement of "not to my

recollection" or by reading his written statement.  *Id*.  Myles also specifically noted that

Plaintiff's allegation of a racist statement by Kleppal, ostensibly a week before the 1/22 incident,

was not reported until after Plaintiff had been accused of threatening Kleppal.  *Id*.  Myles

recommended termination based on violations of Civil Service Rule 9.10 and city policies.  *Id*.

In a letter dated February 14, 2005, Plaintiff was informed that he was terminated for

violating Rule 9.10 of the Civil Service Commission and violating the City's EEO policy as it

relates to workplace violence.  (ECF No. 18-5, Exh. 4.)

Plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission and the

EEOC on February 18, 2005.  (ECF No. 18-3, Exh. 5.)

The parties agree that Plaintiff was reinstated and, on March 18, 2005, Plaintiff and

Defendant entered into a "Last Chance Agreement."  (ECF No. 1 at ¶6; ECF No. 4 at ¶5; ECF

No. 17-1, Exh. H.)  In relevant part, the agreement contained the following provision:

> Mr. Quinones acknowledges and understands that if it is determined that he has
> engaged in any type of threatening or intimidating behavior toward supervisors or
> coworkers that violates the City's Workplace Violence Policy *at any point during*
> *his employment*, **he will be terminated immediately**.

(ECF No. 17-1, Exh. H; ECF No. 18-9, Exh. 8) (italics added, bold in original).

According to Plaintiff, on the night of September 11, 2010, he was assaulted by Kleppal

while responding to a trouble call.  (ECF No. 18-13, Exh. 12.)  In relevant part, his statement,

3

prepared two days after the incident, states as follows:

> ... Mr. Kleppal was in the rear of the linetruck on the passenger side.  He was
> attempting to operate the controls to lower the outriggers, but he was having
> difficulty doing so as he was hitting the wrong levers and unable to select the
> proper function for the controls.  While I stood waiting for [Kleppal] to figure out
> the controls, he looked up at me in frustration as I shook my head.  He proceeded
> to become hostile and irrational by accusing me of laughing at him ....  As
> [Kleppal] went into a rant, I ignored him and continued to perform my job duties
> of lowering the driver side outriggers. [Kleppal] in mid rant approached me from
> the right side and pushed me.  Being caught off guard and almost knocked down I
> grabbed Mr. Kleppal and pushed back in self defense and in reaction.  Stunned by
> the display of violence, I noticed that he had clenched fists anticipating a clearly
> provoked physical altercation.
>
> * * *
>
> The attack as initiated by Don Kleppal was a racially and personally motivated
> assault.

(ECF No. 18-13, Exh. 12.)

According to Kleppal, Plaintiff initiated the physical contact on September 11, 2010.  (ECF

No. 17-1, Exh. J.)  His statement, prepared the same day, states in relevant part as follows:

> I was at W 81st street setting up the Line truck.  I hit the wrong control [illegible]
> Line truck + Q laughed and said you don't know what the f*** you are doing.  I
> told him to get out of the way because the tree was about to fall on someone.  He
> physically bumped into me with his chest to knock me out of the way and walked
> away.  I told him to get the f*** away from me.

(ECF No. 17-2, Exh. 2.)

In a letter dated September 24, 2010, Plaintiff was informed that he was terminated for

violating Civil Service Rule 9.10 and the provisions of his Last Chance Agreement ("LCA").

(ECF No. 17-1, Exh. M.)  In an affidavit, Eric Myles, now Assistant Commissioner for

Cleveland Public Power, noted that of "particular importance" in the decision was Plaintiff's

admission, made during a hearing held on September 21, 2010, that he had physical contact with

4

Kleppal during the altercation. (ECF No. 17-1 at ¶17.) Myles also attributed particular significance to the account given by Robert Space, an eyewitness. *Id.*

In an affidavit, Space stated that he was at the job site on September 11, 2010, with both Plaintiff and Kleppal. (ECF No. 17-3 at ¶¶1-2.) From his position in a bucket, that had not been raised, he was able to observe the altercation that took place between Plaintiff and Kleppal. *Id.* at ¶3. Kleppal was setting the braces on the boom truck, while Plaintiff came around the back of the truck to the passenger side and approached Kleppal. *Id.* at ¶4. "Quinones body checked Kleppal. Kleppal did not touch Quinones." *Id.* He did not hear or observe Kleppal challenge Plaintiff, but heard Kleppal tell Plaintiff to get away from him; the two continued to exchange loud words. *Id.*

### III. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and states:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

In considering summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on

5

which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6ᵗʰ Cir. 1989)(*citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact.  *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Id.*  "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery."  *Anderson*, 477 U.S. at 257.

In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007).  When ruling on a motion for summary judgment, "a judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"  *Anderson*, 477 U.S. at 252 (citations omitted); *accord Fuller v. Landmark 4 LLC*, 2012 WL 1941792 (N.D. Ohio May 29, 2012).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter ...."  *Anderson*, 477 U.S. at 249.  "It is an error for the district court to resolve credibility issues

6

against the nonmovant." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008) ("In effect, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true.  The district court errs by granting summary judgment for the defendant where issues of credibility are determinative of the case.") (citations omitted).

### III.  Law and Analysis

#### A.  Count Ones and Two: Wrongful Termination/Retaliation

Though Counts One and Two are not clearly set forth in the Complaint (ECF No. 1 at ¶¶12-13), Plaintiff clarifies in his brief in opposition that he is alleging that he was discharged based on his national origin and retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*  ("Title VII").  (ECF No. 18 at 6.)

Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... national origin." 42 U.S.C. § 2000e-2(a)(1).  Furthermore, it is unlawful for an employer to "discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

In a Title VII action, a plaintiff can establish national origin discrimination "either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997); *accord DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).  A

7

recent decision from this district has thoroughly summarized the kind of evidence that

constitutes direct evidence.

> Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir.2007) (overruled on other grounds) (*quoting Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)). For example, comments "from the lips" of the employer "proclaiming his or her ... animus" constitute direct evidence of discrimination. Smith, 155 F.3d at 805 (citation omitted). *See also Coburn v. Rockwell Automation, Inc.*, 238 Fed. Appx. 112, 116 (6th Cir. 2007) (stating that "direct evidence is found ... where a statement by an employer directly shows there is a discriminatory motive.") (*quoting Olive v. Columbia/HCA Healthcare Corp.*, 2000 WL 263261 (Ohio Ct. App. 2000)). The statement must not be "isolated, ambiguous, or abstract" and must be a remark "by the employer." *Coburn*, 238 Fed. Appx. at 117–18 (*quoting Hoyt v. Nationwide Mut. Ins. Co.*, 2005 WL 3220192 (Ohio Ct.App.2005)). A discriminatory comment is attributable to the employer when it is made by a "decision maker." *Id.* at 118 (noting the "vital difference" between discriminatory statements by corporate decision makers and "stray remarks" by personnel who are unrelated to the decision making process) (quotation omitted).

*Belzer v. Akron Gen. Med. Ctr.*, 5:08CV3028, 2010 WL 1132684 (N.D. Ohio Mar. 18, 2010);

*see also DiCarlo*, 358 F.3d at 416 ("direct evidence generally cannot be based on isolated and

ambiguous remarks"); *cf. Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003)

("comments made by individuals who are not involved in the decision-making process regarding

the plaintiff's employment do not constitute direct evidence of discrimination"); *Hopson v.

DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002) (comments by manager lacking any

involvement in the decision-making process do not constitute direct evidence).

Plaintiff has not pointed to any direct evidence of national origin discrimination or

retaliation. While at one point in his brief Plaintiff argues that racial slurs were uttered by

coworkers and supervisors against him, Plaintiff has not pointed the Court to any evidence of

statements made by a supervisor or anyone other than Kleppal.

Therefore, Plaintiff must present inferential and circumstantial evidence capable of supporting an inference of discrimination in order to withstand summary judgment.  "A plaintiff who alleges discrimination on the basis of national origin and wishes to prove a *prima facie* case through the use of circumstantial evidence must prove four elements: (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees."  *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (*citing Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir.1995)).

Similarly, the Sixth Circuit explained that Title VII retaliation actions utilize a *modified* version of the *McDonnell Douglas* burden-shifting framework, which requires a plaintiff to establish a *prima facie* case of retaliation by showing: (1) he engaged in activity protected by Title VII; (2) that defendant knew the plaintiff exercised his protected rights; (3) that defendant thereafter took action materially adverse to the plaintiff; and (4) that there is a causal connection between the protected activity and the materially adverse action.  *Jones v. St. Jude Med. S.C., Inc.*, 504 F. App'x 473, 476-77 (6th Cir. 2012); *accord Braun v. Ultimate Jetcharters, Inc.*, 5:12-CV-01635, 2013 WL 3873238 (N.D. Ohio July 25, 2013).

Under his wrongful termination claim, Plaintiff has satisfied the first three elements of a *prima facie* case.  He has shown that he is a member of a protected class based on his Puerto Rican ancestry.  (ECF No. 18-1, Aff. of Pl. ¶2.)  It is also undisputed that he suffered an adverse employment action, as he was terminated from his job.  Furthermore, while the issue is not discussed by the parties, Plaintiff performed his job as a Line Helper Driver for Defendant from

9

2003 until his termination in 2010, giving rise to the inference that he was qualified for the position.  However, Plaintiff has not offered even a scintilla of evidence that he was treated differently than similarly-situated, non-protected employees.  In other words, Plaintiff has not drawn this Court's attention to any evidence capable of supporting the inference that other non-protected employees would not have been terminated for a second violation of Defendant's workplace violence policy or for violating the terms of the LCA.

Similarly, with regard to his Title VII retaliation claim, Plaintiff has shown that he engaged in protected activity by filing a charge of discrimination with the Ohio Civil Rights Commission and the EEOC in January and February of 2005.  It can reasonably be inferred that Defendant knew Plaintiff filed such a charge and that Plaintiff suffered a materially adverse employment action when he was terminated.  However, Plaintiff again fails at the fourth element, because he has failed to present this Court with any evidence that there was a causal connection between the filing of his charge with the EEOC and his eventual termination in September of 2010 – over five years later.  The Sixth Circuit has observed that "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality."  *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir.2008); *see also Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006) ("Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection."); *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363–64 (6th Cir. 2001) ("While it is true that temporal proximity alone is insufficient to establish a causal connection for a

retaliation claim, there are circumstances where temporal proximity considered with other evidence of retaliatory conduct would be sufficient to establish a causal connection.") (internal citations omitted)).

Nonetheless, assuming *arguendo* that Plaintiff has established a *prima facie* case as to both of his Title VII claims, Defendant, nonetheless, would be entitled to summary judgment. Under the *McDonnell Douglas* framework, once a plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to articulate a nondiscriminatory reason for its actions. **The defendant bears only the burden of production; the burden of persuasion remains with the plaintiff at all times**." *Galeski v. City of Dearborn*, 435 Fed. App'x 461, 470 (6th Cir. 2011) (emphasis added) (*quoting Mickey*, 516 F.3d at 526 (citations omitted)). Here, Defendant has satisfied its burden of production by proffering evidence that Plaintiff was terminated for violating the LCA when, after an investigation, it was determined that Plaintiff engaged in threatening or intimidating behavior against a co-worker. Furthermore, while not directly the issue at hand, Plaintiff was only subject to an LCA after an investigation five years earlier resulted in a finding that he violated Defendant's policy against workplace violence. Moreover, the evidence shows that Defendant did not ignore his accusation that he was subjected to national origin discrimination aimed at employees of Puerto Rican descent. Instead, Defendant interviewed six past and present employees of Puerto Rican descent, apparently none of whom corroborated Plaintiff's accusation. The investigation further noted that Plaintiff's accusation was only made after he being investigated for threatening Kleppal thereby reducing his credibility.

Once a defendant has produced evidence of a legitimate, nondiscriminatory reason for its actions, then the burden reverts to the plaintiff to demonstrate that the proffered reason was

11

pretextual and not the true reason for the employment decision. *See Galeski*, 435 Fed. App'x at

470 (*citing Hunter v. Secretary of U.S. Army*, 565 F.3d 986, 996 (6th Cir. 2009).

> "[T]o survive summary judgment a plaintiff need only produce enough evidence
> ... to rebut, but not disprove, the defendant's proffered rationale." *Blair v. Henry
> Filters, Inc.*, 505 F.3d 517, 532 (6th Cir.2007) (assessing pretext in a
> discrimination case), *overruled on other grounds by Gross v. FBL Fin. Servs.,
> Inc.*, 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009).  In order to disprove
> the proffered rationale, a plaintiff must show one of the following: "(1) that the
> proffered reasons had no basis in fact, (2) that the proffered reasons did not
> actually motivate [the] discharge, or (3) that they were insufficient to motivate
> discharge." *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008)
> (alteration in original) (internal quotation marks omitted).

*Jones v. St. Jude Med. S.C., Inc.*, 504 Fed. App'x 473, 477 (6th Cir. 2012)

Here, Plaintiff has failed to present this Court with any evidence capable of rebutting the

Defendant's rationale.  He has presented no evidence suggesting that his employer's finding –

that he engaged in threatening or intimidating behavior towards a co-worker – had no basis in

fact.  To the contrary, there is evidence that at a hearing held September 21, 2010, Plaintiff

admitted to making physical contact with Kleppal on September 11, 2010.  (ECF No. 17-1 at

¶17.)  In addition, an eyewitness corroborated that Plaintiff body checked Kleppal, while the

latter did not touch Plaintiff.[1]  (ECF No. 17-3 at ¶¶1-2.)  There is also no evidence that the

violation of the LCA did not result in Plaintiff's discharge.  Finally, it cannot reasonably be

argued that workplace violence is an insufficient motivation for an employer to discharge an

offending employee.  The only claim Plaintiff presents that appears remotely connected to the

issue of pretext is his argument that the LCA was intended to last only two years.  (ECF No. 18

---

[1] This Court does not decide on the credibility of the underlying witnesses or determine
what actually transpired.  However, the presence of this evidence undercuts any argument
that Defendant's decision to terminate Plaintiff for violation of both its workplace
violence policy and the LCA had no basis in fact.

at 7.)  By implication, violation of the LCA would not be a terminable offense.  Plaintiff's argument, that the agreement was only intended to last for two years, is untenable.  He relies on the following passage from the LCA:

> 4)  Mr. Quinones acknowledges and understands that he will **not be eligible** to work in the **Trouble Section** for a **minimum of two years** from the effective date of this agreement, and will not accept any overtime assignments for such.  His work will be assigned on a daily basis.

(ECF No. 18-9) (emphasis in original).

The above section of the LCA cannot reasonably be construed as establishing a termination date as to the entire agreement.  The plain language of the agreement makes clear that he is simply not eligible to work in a specific unit for at least two years.  Moreover, the LCA, read in its entirety, is not ambiguous.  It unequivocally states that Quinones will be terminated immediately if he "has engaged in any type of threatening or intimidating behavior toward supervisors or coworkers that violates the City's Workplace Violence Policy **at any point during his employment**."  (ECF No. 17-1, Exh. H; ECF No. 18-9, Exh. 8) (emphasis added).  No other reasonable interpretation exists, except that the LCA was to last for the *duration* of Plaintiff's employment.  Plaintiff asserts that the infinite duration of the LCA is "unreasonable" and "draconian."  However, Plaintiff cites no relevant case law to support his position.

Plaintiff has not set forth a *prima facie* case of discrimination or retaliation.  Alternatively, he has not sustained his burden of providing evidence capable of establishing that Defendant's legitimate, nondiscriminatory reason for terminating his employment was pretextual.  Therefore, Defendant is entitled to summary judgment as to Counts One and Two.

**B.    Count Three: Discrimination in Violation of O.R.C. § 4112.99**

In Count Three, Plaintiff alleges discrimination in violation of Ohio law.  (ECF No. 1 at

13

¶14.)  Pursuant to O.R.C. § 4112.02:

> It shall be an unlawful discriminatory practice:
>
> (A)  For any employer, because of ... national origin ... or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Violations of the above statute subject a violator "to a civil action for damages, injunctive relief, or any other appropriate relief."  O.R.C. § 4112.99.

The Sixth Circuit has often reviewed claims under O.R.C. § 4112 together with Title VII claims, as they are subject to the same evidentiary standards.  *See, e.g., Lentz v. City of Cleveland*, 333 Fed. Appx. 42, 45 (6th Cir. 2009) ("the familiar *McDonnell Douglas* framework guides Lentz's discrimination claims under federal and Ohio law."); *Conley v. City of Findlay*, 266 Fed. Appx. 400, 404 (6th Cir. 2008) ("The Ohio Supreme Court has held that the analysis used to evaluate claims under § 4112.02 is identical to the analysis used for Title VII.") (*citing Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 575 N.E.2d 1164, 1167 (Ohio 1991)); *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("Ohio courts examine state employment discrimination claims in accordance with federal caselaw interpreting Title VII.."); *Goodsite v. Norfolk & Southern Ry.*, 2013 U.S. Dist. LEXIS 107334 (N.D. Ohio July 31, 2013) (considering the plaintiff's Title VII and § 4112 retaliation claims together as they "are generally subject to the same analysis").

Because Plaintiff cannot establish a *prima facie* case of discrimination or retaliation under Title VII, or, in the alternative, that the reasons offered for his dismissal were pretextual, he cannot  satisfy the evidentiary requirements of his concomitant O.R.C. § 4112 discrimination claim.

14

### C.    Count Four: Wrongful Discharge Under Ohio Law

In Count Four, Plaintiff asserts "that the discriminatory actions of [Defendant] constitute wrongful discharge under Ohio law."  (ECF No. 1 at ¶15.)  It is unclear how Count Four of the Complaint differs from Count Three.  Plaintiff's brief in opposition offers no clarification.  (ECF No. 18.)

Defendant, while suggesting that Count Four fails to state a claim for relief under Federal Rule of Civil procedure 12(b)(6), construes the Complaint as raising a public policy tort claim as set forth in *Greeley v. Miami Valley Maint. Contractors*, 551 N.E.2d 981, 987 (Ohio 1990) ("a cause of action for wrongful discharge in violation of public policy may be brought in tort"). According to the Supreme Court of Ohio:

> [**P12]  The elements of a claim of wrongful discharge in violation of public policy are as follows:
>
> [**P13]  1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
>
> [**P14]  2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
>
> [**P15]  3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
>
> [**P16]  4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Dohme v. Eurand Am., Inc.*, 956 N.E.2d 825, 130 Ohio St. 3d 168, 171 (Ohio 2011) (internal quotation marks omitted).

Assuming for the sake of argument that sufficient evidence exists to satisfy the first three elements of such a cause of action, Plaintiff's claim still fails.  In this Court's view, the fourth

15

and final element is analogous to Title VII claims, where an employer may rebut a *prima facie* case of discrimination by pointing to a legitimate, nondiscriminatory reason for its actions, and thereby shift the burden to the plaintiff to offer evidence capable of establishing pretext. Such treatment of an Ohio wrongful discharge in violation of public policy tort claim is consistent with the Sixth Circuit's decision in *McDermott v. Cont'l Airlines, Inc.*, 339 Fed. App'x. 552, 555 (6th Cir. 2009), wherein the Court of Appeals assumed "that the Ohio courts would apply the *McDonnell Douglas* burden-shifting framework" when considering such a claim. The *McDermott* court observed that to succeed on the fourth element, "the sheer weight of the circumstantial evidence of retaliation must make it more likely than not that [the employer's] justification is pretextual." *Id*. at 557. For the same reasons stated in the Court's analysis *supra*, Plaintiff has failed to direct this Court to any evidence of record capable of demonstrating that Defendant lacked an overriding legitimate business justification for his dismissal.

Therefore, Defendant is also entitled to summary judgment on Count Four.

### V.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 17) is GRANTED as to all four counts raised in the Complaint.

IT IS SO ORDERED.

/s/ Greg White
U.S. Magistrate Judge

Date: August 22, 2013

16